49 So.2d 97 (1950)
RENUART LUMBER YARDS, Inc.
v.
LEVINE.
Supreme Court of Florida, en Banc.
November 14, 1950.
Rehearing Denied December 21, 1950.
*98 Worley, Gautier & Cannon and Dixon, DeJarnette & Bradford, Miami, for appellant.
Nichols & Gaither, Miami, for appellee.
TAYLOR, Associate Justice.
The appellee, as plaintiff in the Circuit Court of Dade County, sued appellant for damages for personal injuries alleged to have been sustained as a result of negligence of an agent of appellant. Trial resulted in a verdict and judgment in favor of appellee in the sum of $75,000. Motion for new trial was denied.
The first question presented in appellant's brief attacks the sufficiency of the evidence to support the amount of the verdict.
Appellee's injuries resulted from a fall of some twenty feet to a concrete floor. He suffered serious fractures of his right leg and right arm. He also received injuries to his right hip and his back. Protracted, painful and expensive medical and surgical treatment resulted in only a partial restoration of the proper functions of these parts of his body. Appellee's earning capacity at the time of the accident was $80 per week. He earned nothing between the accident and the trial. From a careful analysis of the evidence we conclude that his earning capacity for the remainder of his life has been reduced to approximately $40 per week. This figure is supported by argument contained in appellee's brief.
We must determine what rate of interest should be employed in reducing appellee's future loss of earnings to a present money value. In some decisions this Court has, without discussing the matter in detail, employed the legal rate of interest. While it appears that a number of courts have adopted the legal rate of interest for this purpose, the better rule does not restrict the jury to the legal rate of interest but leaves to the jury within reasonable limits the discretion of applying such rate of interest as it finds to be just and fair under the circumstances. See Annotation in 105 A.L.R. 234. While most of the cases expressing the rule we adopt are under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., we find the reasoning sound and equally applicable to other cases. It is a matter of common and public knowledge that interest rates on investments that may be made with safety by a person of ordinary business ability are now, and for a number of years have been, less than in times past. This factor may vary in the future. It is the function of an award of damages to place the injured party in an actual, as distinguished from a theoretical position, financially equal to that which he would have occupied had his injuries not occurred. To do this the jury may apply, in the reduction of future losses to a present value, a rate of interest lower than the legal rate. In determining whether the verdict in this case is excessive, it is the duty of this court to apply that interest rate which the jury might reasonably have used which will tend more strongly to support the verdict.
We feel that under conditions as they existed at the time of the trial of this case, taking into account the general public knowledge of interest rates payable on government bonds, bank deposits, building and loan association deposits, insurance contracts, and other thoroughly safe investments, the jury would not have abused its discretion in using an interest rate as low as 3%. We will, therefore, use that rate in measuring the judgment.
The appellee at the time of the trial was 42 years of age. He was injured July 22, 1947. The trial occurred February 2, 1949. In using an interest rate lower than the legal rate of interest based upon the practical inability of the investor to *99 secure the legal rate of interest on a safe investment, we are applying common sense and every day knowledge of human affairs to this phase of the question. We must also apply common sense in determining the number of weeks of earning capacity which the appellee might reasonably have expected to enjoy during his life expectancy. The purpose of an award of damages for loss of future earnings is to compensate for loss of earning capacity as distinguished from loss of actual earnings but it would be illogical and contrary to the common and public knowledge of mankind to expect any individual to have an actual practical capacity of working each week during the remainder of his life. Holidays, illnesses and at least some vacation are essential to the maintenance of earning capacity. We believe that the maximum (and in measuring the verdict, we should use the maximum) expectation of earning capacity in an individual over a long period of years can not exceed 50 weeks in each year.
Applying the foregoing principles to the record in this case we find the actual monetary loss of the appellee to be as follows:

Medical expenses ............................................. $ 3,198.95
Loss of earnings prior to trial .............................. 6,400.00
Present value of future loss of earnings at $2,000 per annum
 computed at 3% discount and based on the American Experience
 Table of Mortality ......................................... 33,926.00
 ___________
 Total ............................................. $43,524.95

This leaves more than $30,000 in the judgment which can only be attributed to pain and suffering. The evidence shows that the appellee suffered a very great amount of pain over a long period of treatment; that he will continue to suffer pain; he will, for the remainder of his life, be subject to the humiliation, embarrassment and inconveniences of being crippled in his right leg and in his right arm; but after careful consideration of all the evidence and giving due weight to the finding of the jury, approved by the Circuit Judge, we are constrained to hold that the verdict is excessive. It is not the function of this Court to substitute its judgment for that of a jury or Circuit Court but it is the duty of this court to review the evidence and if we find that a verdict and judgment is, as a matter of law, without sufficient evidence to support it, it is our duty to set it aside or order a remittitur. To reverse a case of this nature because the verdict is excessive, without indicating the extent to which the verdict is excessive, would leave the litigants and the Circuit Court uncertain as to what verdict the same evidence would justify at another trial and might readily lead to further appeals to this Court, with the incident delay and expense, without serving any good purpose.
We have, therefore, carefully reviewed the evidence with the view of determining to what extent the verdict is excessive, viz., to what extent the amount of the verdict exceeds the maximum which the evidence in the case will justify. Having done so, we reach the conclusion that the maximum verdict and judgment which is supported by the evidence in this case is the sum of $60,000.
The other matters argued have been thoroughly examined but we find them without merit.
Since the plaintiff has successfully prosecuted his case to judgment and the evidence clearly indicates the defendant's liability and a verdict has been rendered in excess of the maximum recovery which the evidence will justify, the interest of justice will best be met by permitting the plaintiff to enter a remittitur reducing the judgment to the maximum which the evidence will support.
It is, therefore, the judgment of the court that unless the plaintiff, within 30 days after the mandate from this court is filed in the Circuit Court, enter a remittitur reducing the judgment to the sum of $60,000 as of its date of entry, the judgment will stand reversed for a new trial. If such remittitur is entered, the judgment as modified will stand affirmed.
ADAMS, C.J., and CHAPMAN, THOMAS and ROBERTS, JJ., concur.
*100 HOBSON, J., dissents.
TERRELL, J., not participating.
HOBSON, Justice (dissenting).
The primary question presented for our determination in and by this appeal is whether the verdict of the jury was grossly excessive. A verdict of $75,000, was rendered by the jury and final judgment in that amount was entered on February 3, 1949. Motion for a new trial was denied, whereupon this appeal was instituted.
Appellee was employed as a carpenter by the construction firm of Deigaard & Preston which firm had a contract with Renuart Lumber Yards, Inc., for the construction of certain buildings upon the premises of Renuart Lumber Yards, Inc., in Coral Gables, Florida. On July 22, 1947, the appellee was working upon said premises. Appellee was injured in falling from a ladder upon which he was working, which fall was caused by a lumber cart being backed into the ladder, knocking it out from under appellee. The lumber cart was operated by an employee of Renuart Lumber Yards, Inc. Appellee fell a distance of about twenty feet onto a concrete floor and received severe injuries.
Counsel for appellant do not seriously contend that the facts of the case do not justify liability but they earnestly insist that the verdict was so grossly excessive as to shock the judicial conscience.
At the time of his injury appellee was 42 years old, married and the father of three daughters, He was earning the sum of approximately $80 per week. According to the American Experience Table contained in Vol. 27 F.S.A., he had a life expectancy of 26.72 years. He testified that he was engaged in doing "metal ceiling work and sheet metal." The evidence showed that he could never expect to engage again in the work which he was doing at the time of the accident. However, he is not totally and permanently disabled and may engage in some gainful occupation. The record discloses and counsel for appellee concede that their client might secure a job as a night watchman, or perform some other work similar in character for which services he might expect to receive approximately $40 per week.
At this point the writer is faced with the question: What percentage of interest should be used in reducing future loss of earnings to present money value? Investigation discloses that some states adopt what is commonly called the legal rate which is the rate of interest prescribed by statute where no rate of interest is stipulated in a contract, while others use a lower rate of interest, customarily 3%. Those courts which approve the statutory interest rate give no reason for doing so but many of the courts which have sanctioned a 3% interest rate do so upon the theory that the present worth of future loss of earnings should be calculated by determining what amount would be necessary to produce an annuity equal to an interest yield corresponding to the annual earnings shown by the testimony, by investment at a rate of interest which could be safely made and at the same time assure a steady return. The present money value of future loss of earnings should not be computed on the basis of finding a sum which placed at interest would produce annually an amount equal to the plaintiff's yearly earnings, leaving the corpus intact upon his death, but should be calculated in such manner as to determine the amount which would purchase an annuity equal, during his life expectancy, to his annual earnings.
We approved this basis of establishing the present worth of future loss of earnings in the early case of Florida Railway & Navigation Co. v. Webster, 25 Fla. 394, 5 So. 714, 722, when we said: "In a Texas case (Houston & T.C.R.R. Co. v. Willie, 53 Texas 318) the court says: `If compensation for lessened ability to labor be assumed as the true measure of actual damages, then it would seem that it should not be such sum as would bring an annual interest corresponding with the annual value of this lessened ability, leaving the principal sum still belonging to the estate of plaintiff after his death, although he had then become wholly incapacitated for labor; but would be an amount which would purchase *101 an annuity equal to this interest, during the probable life of the plaintiff, calculated upon a reliable basis of the average duration of human life.' We think this furnishes a good rule by which to measure the damages in such a case. But if the disability to labor is not total, the damages should be graduated to suit the extent of the disability".
It thus appears that in this state we have adopted the rule to the effect that the proper basis of arriving at an allowance for the loss of future earning capacity would be an amount which would purchase an annuity (for the period of his life expectancy) equal to the plaintiff's annual earning capacity. Since none of these annuities can be purchased on a basis which will yield more than 2 to 2 1/2 per cent, it appears that a defendant is favored rather than prejudiced when a 3% figure is used because the higher the percentage used in figuring an annuity based on life expectancy the less the present value is which would be required to insure such a return. Moreover, the present rate of interest on safe investments  investments from which a steady return may be anticipated  does not exceed 3%; for example, insurance companies pay about 2%, building and loan associations pay about 2 1/2% and business experience does not suggest the existence of any investment, which pays over 3%, in which monies could be invested to assure a safe and steady return.
The majority opinion approves the use of a 3% figure in reducing future loss of earnings to present worth in this case, but, as I understand it, the opinion inferentially at least leaves for the jury to determine in each case just what percentage it should employ in its calculation. To my mind such holding would permit evidence of the plaintiff's experience and financial acumen, or lack of it. Apparently the majority view would allow the jury to apply a higher or a lower percentage rule according to whether it determined that the plaintiff was a financial wizard, quasi-financial wizard or a poor hand at handling money. It appears to me that the door would be wide open for conjecture and speculation on the part of the jury because even a financial genius might make a disastrous investment or one slightly versed in finance might "hit the jack pot". It would be a sounder rule to establish a uniform figure of 3% in reducing future loss of earnings to present worth, in order that the plaintiff might purchase an annuity which would yield an annual sum substantially equivalent to his annual earning capacity, with the hope that whatever his position in the business world might be he would pursue such safe and sensible course.
Appellee's loss of earnings at the rate of $80 per week would amount to $4160 per annum. By using the American Experience Table of Mortality, Annuity Values figured at 3%, page 353, Vol. 27 F.S.A., we find the present worth of future loss of earnings to be $70,566.08. Since it may reasonably be anticipated that the appellee will be able to earn $40 per week, his future loss of earnings will amount to approximately $35,283.04. Appellee expended the sum of $3,198.95 for doctors, hospital, nurses' bills and medicines. From the date of the injury to the date of final judgment, which was a period of one year, six months and twelve days, he had a loss of earnings amounting to $6,376.80. These two figures when added together give a total of what may be termed "out of pocket money" of $9,575.75. Combining this "out of pocket money" with the present worth of loss of future earnings after deducting the appellee's anticipated earning capacity we get a grand total of $44,858.79. By this method of calculation it can be observed that the jury evidently allowed the sum of $30,141.21 for pain and suffering. It is with this figure that I am seriously concerned.
Counsel for appellant strenuously contend that the judgment is grossly excessive. On the other hand, counsel for appellee insist with equal vigor that this Court should not substitute its judgment on the question of the amount of damages allowed for pain and suffering for that of the jury because the jurors had the advantage of hearing, and seeing the witnesses, including the appellee, and of observing at first hand the *102 severe and painful character of his injuries.
This Court cannot set up a hard and fast rule or formula as an inflexible guide to be followed by juries in determining the proper amounts to be awarded as damages in personal injury actions. We must determine the question of whether a verdict is grossly excessive upon a careful consideration of the facts and circumstances of each case. In the case of Margaret Ann Super Markets, Inc. v. Scholl, 159 Fla. 748, 34 So.2d 238, 241, this Court, speaking through Mr. Justice Terrell, said: "There is at best an element of speculation as to what figure constitutes a reasonable judgment in such cases. It may vary as men's judgments vary. It is not in the bounds of mathematical exactness, and being human, it may not be as we would have assessed it, but these are not reasons that warrant us in reversing it." The American system of trial by jury has stood the test of time and I know of no better method for evaluating the various elements of damage in a suit of this type than to submit them to a panel of jurors who live in the same community in which the litigants reside and who have identical problems of family livelihood. If a more efficacious plan should be devised it should be adopted, and the jury system administered the coup de grace, by constitutional amendment  not by judicial fiat.
As has previously been stated, the jurors had the advantage of hearing and seeing the witnesses, including the appellee, and of observing at first hand the severe and painful character of his injuries. They were, therefore, in a much better position than are the members of this tribunal to determine the extent of the appellee's injuries and the amount of pain and suffering which he had endured and would thereafter experience. As I evaluate the testimony, though it be only upon a cold typewritten transcript, the injuries which the appellee received could lead reasonable and fair-minded men to the conclusion that the past and future pain and suffering attendant upon them would not be adequately compensated by the allowance of $30,000. Moreover, although there is no legal basis for the inclusion of an attorney's fee in the judgment it is a matter of common knowledge that in personal injury actions lawyers do not customarily perform services for the plaintiff gratuitously. As a practical proposition it is indeed probable that after paying for the services of his attorney appellee would have little, if any, of the $30,000 left. It is an ever-present and constantly recurring fact that the necessity for the suit and the need for counsel was brought about by the negligence of the defendant. Such circumstance cannot be ignored by the writer in performing his part of this Appellate Court's duty to determine whether the judgment is so grossly excessive as to shock the judicial conscience. I cannot subscribe to the view that the judgment here under attack is so grossly excessive as to shock the judicial conscience. Since, however, the majority opinion concludes that the amount allowed by the jury for pain and suffering is sufficiently excessive to shock the judicial conscience this Court should reverse this case for a new trial upon the question of the amount of damages and should not grant a remittitur. By granting a remittitur in this case we not only substitute our judgment for that of the jury but we offend even more seriously by grabbing a figure out of the ether and subtracting it from the judgment. Both improprieties are indulged in the face of the fact that this Court has nothing more than a cold typewritten transcript from which to glean its impressions. In view of the fact that this Court has repeatedly held that it will not substitute its judgment for that of the jury unless upon an inspection of the entire record we become convinced the amount awarded by the jury was grossly excessive, I am not constrained to reverse the judgment. Dunn Bus Service v. Wise, 140 Fla. 341, 191 So. 509; City of Jacksonville v. Vaughn, 92 Fla. 339, 110 So. 529; Seaboard Air Line Ry. Co. v. Callan, 73 Fla. 688, 74 So. 799.
Appellant contends that because the jury came back into the court room after it had been charged and had retired for its deliberations and asked the Court if there had been an attempted settlement with the *103 plaintiff on behalf of, or by, Renuart Lumber Yards, Inc., previous to the action of this Court, either by them personally or by an insurance company, that the jury actually considered the question of whether the appellant was insured. I find that this contention is without merit because the trial judge did not answer or permit this question to be answered and instructed the jury that the question of an attempted settlement, or whether an insurance company was involved, should not be taken into consideration by the jury and that the jury should confine its consideration to the question of whether or not the appellee had proven by a preponderance of the evidence that the appellant was guilty of actionable negligence.
Finally appellant takes exception to the charge of the trial judge, or that part of it which reads as follows: "If you should find that the plaintiff has been to any extent permanently injured or disabled, all such damages which you may allow therefor must be by you reduced to its present money value. In so doing you may take into consideration the decreased purchasing power of the American dollar resulting from the increased cost of living." In my opinion this charge did not constitute reversible error, particularly in view of the fact that a detailed analysis convinces me that the jury used the approved and accepted method in reducing future loss of earnings to present worth. Moreover, it is not inappropriate for a jury to consider the current value of the American dollar and its purchasing power in assessing damages in a case of this character. This is not a case wherein the appellee was permanently and totally disabled and therefore may never again engage in any gainful occupation. Although the loss of future earnings is predicated upon the weekly wage which appellee was earning at the time of the accident, his anticipated future earnings are likewise bottomed upon existing wage scales which conceivably may change materially in future, as they have in past, years. The learned Circuit Judge should not be reversed for having given the above quoted charge since it plumbs the established law of this jurisdiction unless we recede from and expressly overrule our holding in the case of Margaret Ann Super Markets, Inc. v. Scholl, supra, wherein this Court stated: "Jurors are not permitted to divine their judgments from the ether, they are realists and are not actuated by the philosophy of the cemetery. They get leads to their verdicts from the tangible and the commonplace and it speaks in terms of what the dollar will buy, so it availeth little when cotton is 50 cents, corn $2.50, steak one dollar and common labor six dollars, to cite cases that were decided when cotton was five cents, corn was fifty cents, steak twenty-five cents and common labor one dollar. The disparity is such that a verdict or judgment so predicated looks capricious. It would be as reasonable to expect a carpenter to construct a house on the basis of prices that prevailed in 1939. Respect for law will not emerge from judgments so capricious."
If we mean to depart herein from our previously quoted pronouncements made in the case of Margaret Ann Super Markets, Inc. v. Scholl, supra, we should face the issue squarely and, for the sake of stability in the law, do so positively, definitely, unequivocally and not by indirection or inference. The latter method leads inevitably to confusion, tends to increase the almost insufferable burden of this Court, makes a mockery of the doctrine of stare decisis and causes the members of the bar and the judges of the lower courts to stand enmeshed in a quagmire of indecision, uncertainty and conjecture.
I quote with approval from the case of Bowes v. Public Service Ry. Co., 94 N.J.L. 378, 110 A. 699, 700, wherein it was said: "The word `excessive' has a relative meaning. What may be deemed excessive in one environment and social order may be inadequate compensation in another. At a period when the purchasing power of the dollar has in the language of the day been `cut in half,' the value of the sum awarded here is not to be estimated in the numerical quantum of the recompense, but in its comparative ability to furnish the necessities *104 of life. Of these facts the Court must take judicial notice."
It does not appear that in the trial judge's opinion the jury was swayed by passion or prejudice, nor do I find any evidence that it was so moved.
I would affirm the final judgment from which this appeal was prosecuted.